Good morning, your honors. I'm Jennifer Middleton for plaintiff appellant Professor Jennifer Freyd, like fried eggs, as she put it to me when I first met her. And I am sharing three minutes of my time with Jennifer Reich, who is counsel for amici, equal rights advocates and a coalition of other amici. And I'd like to reserve four minutes for rebuttal, which leaves me eight minutes to speak with you at the moment. So I'd like to focus my argument on the district courts errors in usurping the role of the jury in two respects. First, by ignoring disputes of fact and taking inferences in favor of the defendant in its interpretation of equal work under the Equal Pay Act, and then in making the same errors in considering Professor Freyd's disparate impact claim. Starting with the question of work, the language of the statute is equal work on jobs, the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions. That statutory language makes clear that the jobs to be compared can involve different tasks, they can involve different roles, so long as they require equal skill, effort and responsibility for Congress could have said that only identical jobs could be compared, it could have said that only the same tasks or the same exact positions could be compared, but it didn't. Professor Freyd and her comparators here are all full professors of psychology at the University of Oregon. The university imposes on them the same job responsibilities, they go through the same promotional processes, which demand the same education, training and knowledge. They have the same job expectations, which are enforced through regular performance evaluations, both by the administration and separately by their peers, using the same detailed and department-specific criteria for purposes of determining pay and rate. In fact, even the department head of the psychology department admitted to the university's work in objecting to pulling some members of the department out. That said, excerpts of records 471, and I have to note here an apology that the excerpts of record in volume four are misnumbered by six pages, so that was noted in the brief at 465, but it's my apology for that. But in short, this evidence is enough for a rational jury to decide that the same skill... Counsel, can I ask you a question about this? So, I think in the Stanley case, we talk about that they, and you're talking about what I think is encompassed in this, and the idea that you have a common core of tasks for the substantially equal. But then that's the first thing that you have to show, but you also have to show that whatever's outside that common core of tasks, and to quote Stanley, whether any additional tasks can come in on one job, not the other, make the two jobs substantially different. So, as I see it, what you've said absolutely convinces me that there's a common core of tasks here, but there's also different things. There's different things about their jobs, and that's what is the focus of a lot of briefings. So, how come those things don't show that, notwithstanding a common core, that they are There are a couple of points on that. First is, once you get to that level of a common core of tasks and weighing the differences, that's a question for the trier of fact. Those are the kinds of questions that should have gone to the jury in this case. The regulations make that clear that when it comes to weighing the minor differences, that's a question for the prior of fact. But secondly, one of the errors that the district court made here is that the individuals were bringing to this job and looked at the individual ways that they each chose to exercise the skills, effort, and responsibilities, rather than the requirements of the job themselves. And understandably also, that's an error. So, in looking to the kinds of differences the court pointed out, one of them was the source of funding for individuals to get federal funding, rather than private funding for their research. But what the district court failed to do was look at what that funding is allowing the researchers to do, which is run in Professor Bride's case. Well, it's run for those who get federal funding centers, but Professor Bride has a lab where she does essentially the same task of looking at fellows who are doing research, showing the integrity of the research, working within a budget, supervising administrative staff, and so forth. So, again, we have common tasks. The only difference is funding. Whether the funding reports make that substantially unequal is ultimately a question for the district court. The district court also looked at the service role that the training was, from the opinion, like an added duty that I have, but the district court failed to look at the service duty that Bride undertook. So, counsel, let me ask you a question. What I'm struggling with, when I think of tenured professors in these type positions, basically the top of the system, I'm trying to think of what other, I'm not an academic, and so I'm not terribly familiar with it, but I'm trying to think of what else I would compare it to, and the closest thing, from my experience, would be something like equity partners at a law firm, right? And so, you might have equity, and I realize equity partners are not covered by the Equal Pay Act, but just for purposes of sort of, it seems like that type of role of an equity partner at a law firm is, sure, especially if you're talking about labor lawyers, or you're talking about antitrust lawyers, they all have definitely a common core of tasks, they have a common specialty, you have to have gone to law school, a lot of the same type of arguments that you make here, but I mean, we all worked in law firms, or most of us did, and they're not, they're very different, and in fact, it's almost like the role of equity partner is such that built into it, is in order to be a equity partner in a law firm and specialty, you have to have, you have to have a, you have to have a specialty, you have to engage in, and because of that, you might have labor, one labor partner that makes a certain amount of money at a law firm, and another labor partner that is a labor equity partner, but makes different money, and we don't think that's crazy, because of their, you know, the different amounts of money they bring in, etc., how is that not a good analogy to sort of, to these tenured full professors, they're all psychology professors, sure, the baseline of what they need to do is the same, but they're, I mean, part of your argument, it was, they're all the same, and that they're all unique, kind of, I mean, that's what it sounds like, a little bit like equity partners, right, they have a very, they have a very different focus, every single one, in fact, that's what it takes to make full professors, so how does that, does that just mean that these are not the kind of people that can be substantially equal, or not? Well, your honor, to determine that, you know, it's not the kind of people that are substantially equal, would wipe out application of the Equal Pay Act in a large number of professional positions. So, just to be clear, counsel, I think it would only do that in positions that, by virtue of what they're like, they would be, I'm not, the virtue of the job itself requires a whole lot of individuality, and that I can think of as equity partners, maybe professional sports athletes is another thing I thought of like that, and full professors, so I don't know that Parade of Horribles, that this is gonna, I'm, these are pretty unique folks. Well, let me respond to that, and then I'm gonna pass it over to counsel for equal rights, but I think the way that the Equal Pay Act is structured is that once you get to this level of substantial equality of, for example, an equity partner that has the same basic skills, the same effort and responsibility, even though those efforts and responsibilities may be exercised in a very different way, at that point, it's made a prime stage case, and the, there may be many different, very good reasons to train those individuals differently, but that comes up at the affirmative defense stage, and that's where the law firm gets to say, well, we pay this individual more than that individual because they bring in more money, and that's affirmative defense. We didn't even get to that question here, so the Equal Pay Act would allow those kinds of different pay, this comes up. Thank you, counsel. I want to. Good morning, your honors, and may it please the court, Jennifer Reich, on behalf of Amici Equal Rights Advocates and other charitable organizations that joined our brief in support of reversal. The district court's order in this case is grounded in very serious errors of law that if left to stand, as appellant's counsel noted, would effectively weed out large swaths of the American workforce from the protections of the Equal Pay Act and Title VII. If employees who do nonstandardized work cannot even bring an equal pay claim, if subjective assessments of market value can justify gender-based wage disparities, and if employment practices that have a disparate impact only on smaller groups of workers cannot be challenged, then the very discrimination these federal laws were designed to eliminate will be left unchecked. The Equal Pay Act has a broad remedial purpose, which is, as this court affirmed in Rizzo v. Uvino, to eradicate the practice of paying women less simply because they are women. Courts are to construe and apply the law so as to fulfill that fundamental purpose. Counsel, can I ask you, kind of related to my earlier question, is there any types of jobs that are covered by the Equal Pay Act? I understand that some jobs are not, like an equity partner, although I seem to be too close. But are there any types of jobs that are covered by the Equal Pay Act but are so unique, even though they have a label that you attach to it, they're so unique that it would be very difficult to show that somebody was substantially similar, even though they have the same label. But they have a lot of built-in uniqueness. That's the thing I'm struggling with here. It seems like if there is such a category, tenured full professor with all the unique aspects of what they bring to these jobs would likely be one of those. But is there even such a thing, or does the Equal Pay Act mean that every type of job has to be, you can always show somebody who's substantially similar? Well, Your Honor, the Equal Pay Act, as an amendment to the Fair Labor Standards Act, does in fact apply to the vast majority of the American workforce and to all industries and sectors and occupations that are covered by that law. You understand what I'm saying. I'm not saying does it apply in a sense of, I understand it applies in a sense of, but could there be a type of job where just the job is such that you can't show that you're substantially similar? Well, Your Honor, the standard of substantially equal is one that applies, is to be construed broadly. And I would analogize actually the position of the tenured professors here to judges who sit on the same bench, but have very different dockets, or nurses who work on the same unit, but have very different patients. Both of those jobs and the job of professor inherently require a degree of independence and discretion in how one performs one's duties. But the Equal Pay Act and its implementing regulations, and the binding precedent of this circuit and every other circuit that has ruled on this issue, makes it very clear that in order to fulfill the fundamental remedial and broadly remedial purpose of the Equal Pay Act, courts are supposed to look at the overall job content, and are not supposed to compare individuals, but are supposed to compare the work. And looking at a common core of duties, which this district court not only failed to do, in other words, the district court failed to apply the proper legal standard, and failed to even acknowledge the principle of the broad remedial purpose of the Equal Pay Act, and it's anywhere in its decision. It also actually rendered Jennifer Fry's incredible skill, effort, and responsibilities almost invisible. The order goes on for more than four pages, and is extremely, it's a very one-sided view of the evidence that, of course... Counsel, counsel, I don't think that's a fair characterization of the order. I think he praises Professor Fry, and part of his thing is he says she's so unique, as are all the other tenured professors, you know, so I don't think he made her visible. He's quite the opposite, but I think we've actually run over time, but I do want to make sure that Ms. Middleton has some time for rebuttal, so we'll give you a minute and a half on rebuttal, Ms. Middleton. Judges So, Ms. Barron and Mr. Weston, I guess you're dividing time. If you can let us know how you plan to divide time, and what topics you plan to address, and how you, what time you hope to get before you start, that'd be great. Thank you. Thank you, and good morning, and may it please the court. I'm Paula Barron. I represent the University of Oregon, and we should be thinking about Sadovsky. Counsel, you'll have to speak up. Okay. Can you hear me? That's better. There it is. Now we can. I'll push myself forward. I represent the University of Oregon, and Division Dean Sadovsky. Division Dean Sadovsky is, I think, not part of this appeal, because the claims against him were abandoned. Mr. Weston represents President Michael Schill, and we've allocated the time with me taking the bulk of it, and Mr. Weston will take one minute to address that individual claim. I think that the observation that these are pretty unique folks is very much at the heart of what is at issue in this particular case, and plaintiff herself started her case that way. In oral argument before the district court, she actually emphasized just how very different the job responsibilities of these individuals were. She says that the faculty at the university, when they get to this level, develop their own individual agendas. They have studied something different from what anybody else is studying. They go out, and they have something new and different to say about whatever the topic is, and they have each created their own way of effectuating the requirements of the job, including the plaintiff. What about Ms. Middleton's argument that, yeah, but you have the common core, and then you have the additional tasks that may be different, but basically, once you've met the common core, the additional task is question only for the jury. That might, in some cases, be true. This was a different record, and many of the cases that the plaintiff has cited have not had such a robustly developed factual record. What the district court, what Judge McShane had before him, was a very substantial factual record, all of it undisputed. When this motion for summary judgment was filed, it was based entirely on the plaintiff's submissions and on undisputed facts, and that is nothing left here for a jury to decide. In responding, plaintiff occasionally peppered her brief with, that should have been left to the jury, but she doesn't say what the material issue of fact was, so the way summary judgment- Ms. Barrow, can I ask a question here? The undisputed facts go to the other tasks, to the work that each of these professors do, right? That's what you're saying were the undisputed facts that the judge analyzed, but how is that not the very fact of this lawsuit? In other words, there's a difference between giving the court undisputed facts and whether or not those facts then create the question of fact for the jury to decide whether these are substantially the same or not the same. Why does the judge get to decide that these tasks, that the work that these people are doing are the same just because they have undisputed facts in front of them? Yes, and an important question here. It starts, and there are three issues to consider here. First is that this court has repeatedly held that the case does not proceed any further unless the plaintiff has presented a prima facie case, so we have to start with what was the prima facie case, and this court, second, has said to present a prima facie case, you have to take this cluster of the common core of facts and the additional facts that would make them potentially additional duties that would make the positions dissimilar, and you have to demonstrate as part of your prima facie case that it meets the standard of equal skill, effort, and responsibility. The third point that is very important to, and should be very important to this panel, is that the key cases that articulate that test and that have been cited in the briefing were, in fact, summary judgment, which is an important case that talks about differentiation in how to do the individual tasks associated with a job, was a summary judgment case. Stanley versus University of California was a summary judgment case, so this court has looked at this as part of the integration into the federal rules, which allow for summary judgment unless there's a... So counsel, so the thing that most concerns me about this case, of course, is that has to do with the retention races. Yes. And whether there is some kind of cause and effect between retention races and discrimination on the basis of sex. There's a couple of different arguments there. Some of them are based on studies that are much broader than the University of Oregon, suggesting that men may be more movable and that women are less mobile in the academic context, either because of children or because of a husband who's not in the university, and that men may be more movable. Why doesn't that satisfy the prima facie case, and is there any... And do you dispute those facts, or do you accept those? We dispute them, Your Honor, and let me tell you why. The studies that the plaintiff... And as you do that, counsel, you just told me you dispute the facts, and I want to know why they're not material. No, okay. We dispute the implications of the argument because the facts that the plaintiff presented to the court related to a study in England. There's no study, and the plaintiff admitted she had no study related to Pacific Northwest or to the University of Oregon. She didn't know. And second, the additional facts which were undisputed, again, in this case do not demonstrate that. The evidence that supported that argument that the plaintiff raised were a couple of conclusory statements in declarations that, in general, we think that women are less likely to go out and look for other positions. But the women who have shown up in this case, other than the plaintiff, include Professor Dara Baldwin, a woman who negotiated with British Columbia and negotiated with Cambridge in England and demonstrated that she was capable of doing it. The plaintiff, who herself was capable of negotiating a move, a very good move for herself to Oregon, and then admitted that she elected not to look at retention offers as well. So I would suggest, Your Honor, that there is no admissible evidence in this record to support the argument that women are unable to come up with an outside job. And in fact, the plaintiff admitted... You know, counsel, I'm surprised to hear you take such a strong stance on that, because you have internal studies conducted by various people in the psychology department, Professor Fryde herself, the department chair, Professor Meyer, and others that did the number of regression analyses and then tried to explain the differences between the men's salaries and the women's salaries. So I'm a little surprised to hear you be so dismissive of the evidence. So there is a very large record, and there are pieces of the record that the plaintiff is overlooking. But specifically as to plaintiff's own internal studies that presented, one of the very, very important issues that the plaintiff does not mention is that Ulrich Meyer, who was the department head, also pointed out that when he looked at the studies, if he put back into the mix Helen Neville, who was the highest paid person in the department for many, many years up until her retirement, what he referred to it as the sign flipped, which meant that the results were very different. So they were quick and dirty evaluations. But in addition to that, anytime you look at a statistical analysis of any kind, you have to be looking at more numbers than are present here. There is a... Okay. Now, counsel, because the base is too small, because we have sample size is too small? A population is too small, data set is too small. Yeah. And we know that the population is too small as a matter of law? We do. Because when this court has looked at statistical analysis, it has generally determined that as a matter of law. I would point out, for example, that the Daugherty case in this court was a summary judgment case. And the cases that we have cited in our brief were summary judgment cases. Now, if we had two statisticians, one who says the sample is too small, and the other one says the sample is okay, that would be a material dispute of fact, right? Or would it not? Well, it may not. Because it may... Remember, the whole outcome of the Daugherty litigation was to give the trial judge a gatekeeper role. And that gatekeeper... Well, that would be... That's a dobert question. But I want you to suppose that I have two reputable statisticians. One says, I don't think this sample size is enough. And the other one says, it's not ideal, but it is sufficient that we can draw. Now, do you really want me deciding this as a matter of law? I've got a background in economics, and I took a statistics class, but it was a long time ago. Which is one of the reasons, Your Honor, that the impact claims have been so stringently defined by the court. So we're sort of in the realm of statistical evidence for the impact claims. And if you have the dueling experts, even if you were to say that there were to be an issue of fact here as to whether or not there was a statistical disparity, you still have multiple steps that you must go through. So the plaintiff must, for example, start by identifying what causes that impact. So as to our hypothetical experts, we don't know whether or not they're able to pinpoint what caused the impact, what was caused here, except to the extent that somebody is talking about retention raises. And retention raises is not something that can be identified as a single pinpointed issue. It's a vast process. All of the impact cases as a matter of law say you cannot use an impact case to talk about a process that has multiple parts. It has to be something where you can focus on this is why. So perhaps if your experts were able to present evidence that said women fundamentally are not capable of finding outside jobs, and here's the data, that might be something where you might be able to argue whether that was or wasn't one of these factors. But what the plaintiff is doing here is taking something that was vowed by the Supreme Court in an old case called Connecticut versus Teal. You can't look at the bottom line and say we have an impact. You must look at what actually causes the impact. And as the undisputed facts in this record show, the impact here, whatever causes it, is impossible to discern from all of the factors that the decision makers go through in making a retention decision. Do we need this person? Do we have the money? Does the work matter? Is this somebody who's going to take a lab that we just built and vacate it and now we have all this real estate? And they go through this analysis, which is a very lengthy analysis, and then they try to figure out do we actually want to retain this person or do we want to give them a pass? Is this somebody who's got one foot out the door already? And all of the factors were discussed in the various declarations. They were all undisputed as to the degree of analysis that this university is making those retention raises. And what plaintiff has said is it's just the retention process that causes the impact. By law, that's insufficient. By the decisions of this court, that's insufficient. So you can't simply say that because there is a difference, we get to go to trial. We had cited in this case a decision called Hughes versus Rudabush, which was a partial summary judgment. And one of the questions that was raised there was if you have the impact, can't you just go forward and fix it? And the answer is that's not enough. You can't just say that there is a differential in the wages and then turn around and as a public body try to remedy it. Similarly, decades of affirmative action cases have been held as a public body. You are not either legally required or legally permitted to go forth and try to correct disparities that you yourself did not cause. So it's a lot more complicated than the plaintiff's description and the plaintiff's argument. But all of the... Counselor, in your last minute, could you tell why the Oregon statute that uses the words comparable is not broader than the Equal Pay Act? So the Oregon statute that uses the word comparable is also further described by its regulations. And we argued this below and we cited them to the court. Those regulations require the plaintiff to that the job has the same level of responsibility. And one of our very important arguments in this case is that the nature of the federal funding imposes vastly different responsibilities on the holders of those large federal grants. And that is exactly one of the factors that the Oregon statute requires to be considered. Responsibility includes the kind of accountability that can pose burdens on the employer. And we've laid out in a fair bit of detail what happens if these holders of the federal grants don't carry out their responsibilities appropriately. Are the grants paying part of their salary or are they getting additional money because they're bringing grants in? The grants are paying part of their salary in some cases. So Professor Fisher, for example, has outside funding that pays for him 100 percent. So there is some accountability there. None of the decisions that were made here, the plaintiff challenges, are simply because somebody has brought in money. The issue that the university presented to the fall court was having the grant changes the job duties to a significant degree. That's out of what the Equal Pay Act makes illegal conduct. So to cycle back to the question that you originally asked, the Oregon statute uses different languages, but the Oregon statute requires consideration of responsibility in a job. And we would suggest that Ulrich Meyer's 20 employees that he supervises is a different degree of responsibility than those who are managing their centers. So Ms. Barron, we ran over a little bit, but I just want to make sure one thing, sort of for my personal housekeeping, on the Equal Pay Act claim, you know, we've focused on the brief focus on the substantially equal work aspect of this. And of course, there's the affirmative dissent side of this, but I don't see where I think you've reached that. There is other argument in regard to other claims that it seems to me would be that the, it seems to me your argument would be that a job factor, related factor other than sex, would be the retention raises. That the retention raises would be, if you get to that, the retention raises would be a job factor other than sex. But you haven't really got to that, have you? Is that informs the Title IX claim, which doesn't require the same type of analysis that the Equal Pay Act claim is, but our motion was based on the differences in the jobs. And that's the primary. Yeah, right. So if we, so just to be clear, so if we were not to, if we were thinking that the district court should not have ran a summary judgment on that basis, what do we just, we don't reach the affirmative defense for the Equal Pay Act claim, we just, we would send it back for you to litigate that in the district court, or? If you conclude that the jobs were equal, I think that... No, but to be clear, if we conclude that the district court should not have granted summary judgment on that, that is a jury question. I think that, I think this court can go forward. It is in the record, and the court can decide this case on anything that finds its basis in the record. So it would be our belief that you could look at that. Okay, and then on that, I guess the Oregon claim, the Oregon Equal Pay Act claim or whatever would be similar. It's different initial standard, but if we didn't think that was met, you have a similar, at least in the 2017 version, you have a similar affirmative defense, good faith factors other than sex. And so you'd be similar, but I don't think you made that argument really. So we'd have to basically try to pull that from other parts of the brief, I think. Yes, it wasn't fairly called for and plaintiff had not filed her claims under the new version of the statute. So we tried to argue. But to be clear on the disparate impact claim, you do present the as a practice is job-related and business necessity. So I do think you're, I think the argument's joined on that, if I recall from the briefing. Yeah. And it's the retention raises were actually raised by the plaintiff as part of her claim. So our response is to follow the structure that is required by the court to demonstrate that what we, what the university does is job-related and consistent with business necessity. And that was, that was joined in this, in this below and in this appeal, I think is that that's right. So it's presented in that context, but it doesn't seem to me that it's presented real well or joined in the, in the Equal Pay Act context, either the federal or the Oregon. Is that accurate? I think it wasn't, it wasn't discussed in considerable detail in the Equal Pay Act because of the task-based analysis that we relied on. Okay. Judges, do you have any other questions? No. Okay. So why don't we have a minute for Mr. Weston? Thank you, your honor. I'll be very brief and may it please the court, Cody Weston for defendant appellee, Michael Schill, who's the university president. So first and foremost, we join in all of the university's arguments, but I would add for president Schill himself, there's only one claim against him, the fifth claim for relief and the district court dismissed that claim for among other reasons that president Schill had qualified immunity and on appeal plaintiff has not challenged that ruling or that aspect of the court's order. And so for that separate and independent reasons, president Schill should be, or the district court's order should stand with respect to president Schill on the sole claim against him. Thank you, counsel. So we'll go back to Ms. Middleton. Maybe you can address, do you agree with what he just said as far as the president is out of the case? That's correct. We didn't appeal the protection claims. So individually, the president is out of the case. Okay. So addressing Ms. Barron's points. First, I'd like to say that a jury could absolutely find on this record that the skills, effort, and responsibility exercised by the different comparators are substantially equal and that the decisions for itself. So for example, on the service component, the district court didn't even consider that professor Fried won a university-wide award for the extent and importance of her service contributions to the university. That is absolutely material and undisputed evidence that she exerted more effort in that component of her job than her comparators did. And a jury should be given the opportunity to consider that evidence and others. On the question of the statistical analyses, as Judge Bybee correctly pointed out, there are substantial admissions in the record of the department itself of the statistical disparities in the department, the pay gap, and that it's caused by this retention-raise practice. So they've admitted that fact. Well, they've admitted that statistical evidence to make up the prima facie case for a disparate impact claim. But we also submitted the affidavit of labor economist Cahill, who came to the same conclusions. The defendants submitted their own expert, but that expert didn't even claim that the data set that Cahill was looking at in terms the population of the department was too small or too few observations. So we don't even have the dueling experts problem here. We have one expert who's uncontroverted in his decisions. And so considering that evidence should also go to the jury. On the question of Oregon's comparable work of comparable character analysis, the one case that even approaches addressing this issue is Boley versus the city of Roseburg from 1985. In that case, the court of appeals found that a female transit coordinator did work of comparable character, in fact, substantially similar work to a shop superintendent, a sewer plant superintendent, an engineering supervisor, a maintenance superintendent. So clearly different tasks, different job titles, different day-to-day work, no doubt, but that was work of comparable character. And that gives us a flavor for how much broader... Thank you, your honor. Well, counsel, can I ask, one question has sort of been bugging me, I guess, is if you are correct and you were able to convince a jury, this went to a jury and jury said that it is substantially similar work and no affirmative defense, and so you won on your Equal Pay Act. Doesn't that basically result in a requirement for lockstep pay for all the... Sort of like associates in a law firm, right? There'll be some factors, there'll be a few factors that you would take into account, but essentially outside those factors, which might include publication rates or years of service or something like that, you essentially would have to have lockstep pay for tenured faculty, at least within a psychology department, and I'm not sure, maybe across the university. No, your honor, it doesn't call for lockstep pay because one of the considerations at the University of Oregon in setting salaries are merit determinations that are done department-wide for, you know, each department internally does them, and the psychology department's list of merit considerations, you know, how that determination is made is detailed and is in the record, but the department does these determinations every time raises are available, and so people fall in different places on that merit analysis and that determines their raise. So it's not lockstep, it's merit determined, and the criteria for what goes into a consideration of strong merit can change over time depending on the needs of the university. And you don't think that getting an offer from another university is some indicator of merit, getting an offer, and the university saying we want to keep you in order to keep you from merit? Well, your honor, it's not job-related, so in that way, it can't be an affirmative defense. How is it not job-related? Because it seems to me like the reason that they're trying to poach you away is because you're such an awesome professor. You do such an awesome job at your job. It's not job-related for the same reason that prior pay is not job-related, according to... But that's different because prior pay, it seems to me, in the Rizzo case, prior pay, they said, well, we've got this endemic sort of discrimination and you're going to continue. If you base people's current pay off of what they made before, that discrimination is just going to be promulgated by that. But that's different than other universities. It may be, I suppose, that offers from other universities somehow promulgate discrimination, but it would be a very When a university says, I really, really want this person, they've got many reasons for wanting that person. They're famous. They would fit very well with their program, etc. And those are all related to their current job. It's their current job. And so I don't think that it's... I don't think you can say because of Rizzo that these offers fall into that same sort of rationale. It doesn't make sense to me. I'm sorry, you timed out for a second there, but I think I understood your quick question. And to respond to it, under the analysis in Rizzo, what an individual might get paid for doing a different job at a different university, just simply by definition, isn't related to the job that they're doing currently for the University of Oregon. I don't understand. I don't see how that's what Rizzo says. Rizzo says, we know that across the board out there that women make less than men. And so there's built-in sort in salaries. And so if we just allow people to only pay people what they currently make based on what they made in the past, that will continue to carry forward that gender discrimination. It's a very different thing to say that the reason that a university is giving you this sweet offer is based off of some sort of promulgating discrimination, I'm promulgating isn't the right word, but carrying forward discrimination. When in fact, I mean, intuitively, the reason the university is trying to poach the person is, would seem to be because the person, you know, fits these different factors. They have something that they could bring to the university's already existing program. They fit really well with the university. They're famous. They're super, you know, that's very different than Rizzo. Okay. Think of it this way, to the extent that Rizzo acknowledges that there's widespread gender discrimination and pay gaps in society at large, there's no reason to think that that's not replicated in the process of offered. So that's the argument, boy, I mean, actually that's where you have to go. I think you'd have to, and basically then everything, everything has gender discrimination built into it. And I don't know, it seems to me that Rizzo either needs to be limited to it's, you know, what it's saying or, or, you know, it proves everything almost. So in any event, you'd have to prove it in this case, as opposed to, as opposed to just saying Rizzo applies on this case, I think. Let me just say quickly, the facts in this case show that women are treated differently than men when they seek retention raises and that they're more reluctant to go out on the market in the first place for a variety of gender reasons. So you don't even need to go to society writ large. You have evidence in the record that shows the impact right here at the University of Oregon. Yeah. I remember the argument being made in the briefs. Okay. Well, thank you, counsel. Judges, do you have any other questions? No. All right. Well, thank you very much for your helpful argument and this case, the Fried case, will be submitted on this argument today. So thank you very much. And we will dismiss, I guess, all the counsel and judges. Do you mind if we take a five to ten minute break? That's fine. Thank you, counsel.
judges: Bybee, Vandyke, Cardone